# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MAE V. HAMPTON,**

**Plaintiff,**

**-vs-**                                               **Case No. 6:04-cv-1205-Orl-KRS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION,**

**Defendant.**

_____

## ORDER

This matter came before the Court for consideration without oral argument on the

complaint filed by Mae V. Hampton seeking review of the final decision of the Commissioner of

the Social Security Administration ("Commissioner") denying her claim for social security

disability benefits.  Doc. No. 1.  The Commissioner answered the complaint and filed a certified

copy of the transcript of the proceedings before the Social Security Administration ("SSA").  Doc.

Nos. 8, 10.  The parties have consented to the exercise of jurisdiction by a United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle

District of Florida Local Rule 6.05 for adjudication.  Doc. Nos. 9, 11.

## I.        PROCEDURAL BACKGROUND.

In March 2000, Hampton applied for disability benefits under the Federal Old Age,

Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401 *et seq*., and the Social

Security Income for Aged, Blind, and Disabled program ("SSI"), 42 U.S.C. § 1381 *et seq*., alleging

a disability onset date of October 15, 1999.  TR. 92, 480.  The SSA denied Hampton's applications

both initially and on reconsideration.  TR. 37-42, 57-59, 483-92.  Then, Hampton made a timely

request for a hearing.  TR. 61.

An Administrative Law Judge ("ALJ") held a hearing and  issued a decision finding

Hampton not disabled..  TR. 43-49, 538-60.  Hampton appealed this decision.  TR. 70-79.  On

January 24, 2003, the Appeals Council vacated the ALJ's decision and remanded the matter for

further proceedings.  The Appeals Council specifically instructed the ALJ to have Hampton

undergo psychological and physical consultative examinations.  TR. 80-82, 502.

After the new consultative examinations were completed, a different ALJ held a hearing on

February 12, 2004.  TR. 500.  Hampton and a vocational expert testified at the hearing.  TR. 500-

37.  At the hearing, Hampton's attorney stated that Hampton only sought benefits for the period

between Hampton's alleged onset date of disability and August 15, 2002, the date on which

Hampton returned to work.  TR. 503-04.

The ALJ found that Hampton had not engaged in substantial gainful activity during the

requested closed period of disability, but he noted that Hampton earned money in 2000, 2001 and

2002, which he concluded was indicative of a significant ability to work.  TR. 12, 18.  The ALJ

concluded that the medical evidence showed that Hampton had a history of cocaine abuse, alcohol

abuse, sarcoidosis,[1] bulging lumbar discs, a history of cervical and lumbar strain, a history of

temporomandibular joint disease (commonly referred to as "TMJ"), and a depressive disorder.

---

[1] Sarcoidosis is "[a] systemic granulomatous disease of unknown cause, especially involving the lungs with resulting fibrosis, but also involving lymph nodes, skin, liver, spleen, eyes, phalangeal bones, and parotid glands." STEDMAN'S MEDICAL DICTIONARY 1571 (26th ed. 1995) (hereinafter "Stedman's").

TR. 14.  She found that Hampton's combination of impairments were severe, but that they did not meet or equal an impairment listed in the SSA's regulations.  TR. 14.

The ALJ found that Hampton had the residual functional capacity ("RFC") to do the following: (1) lift up to ten pounds occasionally and five pounds frequently; (2) stand or walk for up to two hours and sit for up to six hours in an eight-hour workday with an opportunity to "get up and stretch" every hour; (4) occasionally climb stairs, balance, and stoop; (5) never climb ladders, crouch, kneel or crawl; (6) never be exposed to concentrated heat, humidity, cold, dust, fumes, or gases; (7) have only occasional contact with the public; (8) not perform detailed or complex tasks. TR. 18.  The ALJ concluded that Hampton retained the RFC to perform a restricted range of sedentary work.  TR. 18.

In reaching this assessment, the ALJ found the two functional capacity assessments of Dr. Zeya, a treating physician, to be internally inconsistent and not supported by his final impairment rating.  TR. 16.  The ALJ also gave little weight to the mental functional capacity assessment by Dr. Mukherjea, another treating physician, because of Hampton's lack of treatment, non-compliance with treatment, and ability to run a household.  TR. 17.  The ALJ further found that Hampton's allegations regarding her limitations were not credible based on the medical evidence in the record.  TR. 15.

The ALJ found that Hampton could not return to her past relevant work.  TR. 18.  The ALJ relied upon the opinion of a vocational expert ("VE") that there was work available in the local, state and national economy that Hampton could perform.  Accordingly, the ALJ concluded that Hampton was not disabled.  TR. 19.

Hampton requested review of the ALJ's decision.  TR. 7.  On June 9, 2004, the Appeals

Council found that there was no reason to review the ALJ's decision.  TR. 3-5.  Hampton timely

sought review of this decision by this Court.  Doc. No. 1.

## II.   JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Hampton's

application for disability benefits under OASDI and SSI.  Therefore, the Court has jurisdiction of

this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

### A.   *Hampton's Testimony.*

Hampton was born on September 19, 1958.  TR. 505.  She graduated from high school and

attained an AA (associate in arts) degree.  She had some vocational training as a truck driver and a

security guard.  TR. 505-06, 549-50.  At the time of her first hearing, she was taking cosmetology

classes, but she did not finish the course.  TR. 505, 549.

At the time of her second hearing, Hampton was working part-time driving a shuttle bus.

TR. 515-16.  Hampton worked as a school bus driver in Seminole County, Florida from

approximately 1983 to 1994.  TR. 507.  She lost this job for missing too many days of work due to

depression she experienced after her boyfriend died.  TR. 507.  In 1996, she worked as an armed

truck driver for a time.  TR. 508-09.  Hampton also work as a cashier at a gas station, as a delivery

driver for a liquor distributing company, and as a bus driver.  TR. 510-11.  She also briefly held

some short-term positions after her alleged onset date of disability, but she could not sustain them

due to depression and panic attacks.  TR. 511, 545-46.  She testified that she had been mentally ill since 1978, but that she was able to "deal with it" sometimes better than other times.  TR. 512.

Hampton's sarcoidosis caused her to have shortness of breath with any fast walking or jogging or repetitious exercise.  It also caused headaches from not being able to breathe.  TR. 506. She estimated that she could walk about one or two blocks before she would be out of breath and could be on her feet for about twenty to twenty-five minutes at a time.  TR. 544.

Hampton began to experience back pain following an automobile accident in 1997.  TR. 512.  This pain gradually worsened until it prevented her from being able to sit in one place long enough to work as a driver.  TR. 512.  Standing made her feet swell, and she needed to sit down about every twenty to twenty-five minutes.  TR. 544.  She was not to climb stairs due to her back pain.  TR. 514.  Working for sustained periods and driving caused back, shoulder and neck pain. TR. 521.  During particularly painful periods that she experienced at least once a month lasting one or two weeks, she had difficulty walking and holding objects with her left hand. TR. 520-21. When sitting, she needed to stretch about every fifteen to thirty minutes.  TR. 521, 545.  She could not lift or carry anything heavy.  TR. 521, 545.

Hampton has been prescribed Zoloft and other medications for her depression.  TR. 516, 552.  The medications helped her "wing it," but they did not "totally take care of the problem." TR. 516.  Hampton testified that her depression made it impossible to deal with children, noise, music, or television.  TR. 514. She experienced panic attacks when she became frustrated with children on the bus she drove or with her daughter, or when she had an unexpected change in routine, such as being required to drive a different bus.  TR. 525-26.  Panic attacks could cause her

to scream and holler, vomit or have diarrhea, have difficulty breathing, and to have a headache. TR. 526, 554. When she had panic attacks or depression, she needed to stay home and relax, which caused her to miss work.  TR. 548, 553.  At her first hearing, she testified that she had panic attacks three to four times a week.  TR. 555.  She did not want to pursue a once-per-month counseling program recommended by her mental health doctor because she "didn't feel like sitting there.  They're looking at me and I'm just talking and talking and they're just looking at me and they ain't got no feedback for me and when I leave there, I am tore up."  TR. 528.

Hampton used cocaine socially until approximately 1993 or 1994.  TR. 516-17, 542.  She used to use alcohol, but stopped because of the way it interacted with her depression medication. TR. 517.

In 2000, Hampton lived with her two daughters.  At that time, she was able to clean and dust only a little bit at a time.  TR. 148-49.  By the time of her second hearing, Hampton testified that she lived with one of her daughters off and on.  TR. 518.  On a typical day, she would arise at around 6:00 a.m., though sometimes she awoke between 1:00 and 3:00 a.m., and went to bed at 8:30 or 9:00 p.m.  TR. 543, 547.  She would often take Naprosyn[2] or Soma[3] for her back pain and then lie down to rest.  TR. 543, 552.  These medications made her groggy and sleepy, which is why she went to bed early.  TR. 556.  When she was not working, she would sit on her couch for hours and then sit outdoors for hours.  TR. 519.  She could not focus to get anything accomplished,

---

[2] Naprosyn is a non-steroidal anti-inflammatory drug.  DRUGS.COM, *at* http://www.drugs.com/ mtm/n/naprosyn.html (last visited Sept. 29, 2005) (hereinafter "Drugs.com").

[3] Soma is a muscle-relaxing drug.  Drugs.com *at* http://www.drugs.com/mtm/s/soma.html (last visited Sept. 29, 2005).

and she was forgetful.  TR. 151, 519.  She used to love to cook, but she could not cook or do housework any more.  TR. 522, 548.

      B.    *Vocational Expert's Testimony.*[4]

     The VE testified that, under the SSA's regulations, Hampton's driving jobs required a medium strength level and were semi-skilled, but were performed at the light strength level.  TR. 532.  Her past work as a cashier was light, unskilled work.  TR. 533.  The VE testified that if Hampton could perform a full range of light work, she could return to her past work as a cashier either as she had previously performed it or as it is performed in the economy.  TR. 533.

     Next, the ALJ posed a hypothetical person subject to the following limitations: (1) lifting, carrying, pushing, and pulling would be limited to twenty pounds occasionally and ten pounds frequently; (2) the ability to sit, stand, or walk for six hours in an eight-hour day, with the need to alternate sitting or standing at least once every sixty minutes; (3) no ability to climb ladders and only occasional ability to climb stairs, balance, stoop, crouch, kneel, and crawl; and (4) no concentrated exposure to humidity, heat, or cold or to dust, fumes, or gases.  TR. 533.  The VE responded that a person with this hypothetical RFC could have performed one of Hampton's school bus driver jobs and her cashier job, but not her armored car job because of the exhaust fumes to which she was exposed in that job.  TR. 534.

     The ALJ posed a second hypothetical person with the following limitations: (1) lifting, carrying, pushing, and pulling would be limited to ten pounds occasionally and five pounds frequently; (2) the ability to sit for six hours in an eight-hour workday; (3) the ability to stand or

---

[4] I only present VE testimony from Hampton's second hearing because the VE testimony from her first hearing is irrelevant to my analysis.

walk for two hours in an eight-hour workday; (4) the need to be able to stretch once per hour; (5) no climbing ladders, crouching, kneeling or crawling; only occasional stair-climbing, balancing, and stooping; (4) no concentrated exposure to humidity, heat, or cold or to dust, fumes, or gases; and (5) no detailed or complex tasks, in other words unskilled work only.  TR. 534.  The VE responded that the hypothetical person could not perform Hampton's past relevant work.  TR. 534. However, the hypothetical person could perform work as an assembler, lens inserter, or billing, posting, and calculating machine operator, all of which jobs were at the sedentary, unskilled level. These jobs existed in significant numbers.  TR. 534-35.

Then, the ALJ added to the hypothetical individual's RFC that he or she could have only occasional interaction with the public.  TR. 535.  The VE opined that this individual could not perform the jobs previously identified.  TR. 535.  Next, the ALJ asked whether work would be precluded if the hypothetical individual would be being absent from work more than three times per month and be able to work only half days.  The ALJ opined that it would.  TR. 535.

   C.    *Medical Evidence.*

      1.    Physical Condition.

Beginning in July 1997, Nelson Mane, D.C., treated Hampton.  TR. 192-250.  At the initial visit, Hampton reported that she had been involved in a motor vehicle accident on July 11, 1997. She complained of headaches, dizziness, anxiety while driving, neck and shoulder pain and stiffness, back pain and stiffness, and tingling in her left foot.  Upon examination, Dr. Mane noted that there was tenderness, spasm, and restriction in her lumbar spine.  TR. 249-50.  Dr. Mane's

assessment was cervical cranial syndrome,[5] cervical radiculopathy,[6] thoracic strain,[7] lumbar radiculopathy, possible TMJ syndrome,[8] and myofascitis.[9]  TR. 250.  Hampton received chiropractic treatment through October 1997.  TR. 192-250.  Notations from the treatment indicate that Hampton consistently exhibited low back pain, which was treated with heat, traction, and electric pulse therapy.  TR. 195-209.

Keith Simon, M.D., an orthopedic surgeon, examined Hampton in July 1997.  TR. 246-47, 251.  His impression was cervical strain/sprain with muscle spasm and some loss of motion with intermittent loss of sensation in her left foot and the absence of an Achilles reflex, which was indiciative of a disc herniation or at least radiculopathy.  TR. 247.  Dr. Simon examined Hampton again in August 1997.  At that time, Hampton's neck was feeling better, but she still had limitation on extreme range of motion.  Her left foot was still numb, and she did not have an Achilles reflex on the left.  TR. 214.  Dr. Simon's diagnosis was possible left S1 radiculopathy, possibly related to a herniated disc.  *Id*.  A September 9, 1997, MRI of Hampton's lumbosacral spine revealed a disc bulge at L4-5 that did not involve any canal or neural foraminal compromise.  TR. 389.

Dr. Mane's last update report, dated October 17, 1997, reflects that Hampton's neck and mid back pain had resolved, but she still had intermittent low back pain.  Dr. Mane observed

---

[5] Cervical cranial syndrome is an aggregate of signs and symptoms relating to the neck or head.  Stedman's at 314, 408.

[6] Cervical radiculopathy is inflammation of the spinal nerve roots in the neck.  Stedman's at 1484.

[7] Thoracic strain is an overuse or overexertion of a muscle in the thorax or chest region.  Stedman's at 1806.

[8] TMJ syndrome refers to a painful dis-function of the joint between the jawbone and the skull.  Stedman's at 1769.

[9] Myofascitis refers to induration, or hardening, of a muscle due to the growth of fibrous tissue.  Stedman's at 1171.

spasms and tenderness in the lumbar spine area, with some limitation of motion.  TR. 192.  Dr. Mane opined that Hampton had a permanent injury resulting from the motor vehicle accident, involving lumbar sprain and disc bulge.  TR. 192.

On April 27, 2000, Robin R. Hughes, M.D., examined Hampton at the request of the Florida Office of Disability Determinations.  TR. 252.  Hampton complained of chronic low back pain, with difficulty in prolonged sitting, standing or walking without frequent changes in position. TR. 252-53.  She was able to walk and perform deep knee bending with some difficulty due to back pain.  TR. 254.  Her range of motion was within normal limits.  TR. 255-56.  Dr. Hughes noted that Hampton's weight was 199 pounds.  TR. 253.  Dr. Hughes opined that Hampton would be subject to the functional restrictions of sitting or standing less than an hour without a change, no repetitive stooping or kneeling, and no lifting over twenty pounds.  TR. 254.  His assessment was that Hampton had chronic low back pain caused by a motor vehicle accident.  TR. 254.

On April 10, 2000, a CT scan of Hampton's chest revealed irregularities.  Hampton reported that she had experienced shortness of breath and chest pain for about one year, and that she had sharp soreness under her left shoulder blade.  TR. 274.  A spirometry test revealed very mild restriction.  TR. 275.  Adam S. Katz, M.D., opined that Hampton might have sarcoidosis. TR. 276.  In a follow-up report dated July 12, 2000, Dr. Katz confirmed his diagnosis of sarcoidosis with mild dyspnea.  TR. 270; *accord* TR. 263, 269.

On December 27, 2000, Patrick A. Ijewere, M.D., examined Hampton at the request of the Florida Office of Disability Determinations.  TR. 334.  Hampton complained of lower back pain aggravated with sitting more than three minutes or holding her hands up more than three minutes.

-10-

She also had occasional shortness of breath with walking one block.  TR. 334.  Upon examination, he observed mild lumbosacral tenderness.  Dr. Ijewere's impressions were moderate low back pain and breathing problems that were episodic and not severe.  TR. 336.

On January 24, 2001, Hasan Zeya, M.D., conducted an initial medical examination of Hampton after a motor vehicle accident she was in on January 22, 2001.  TR. 362.  Dr. Zeya ordered her to rest for five days and undergo physical therapy treatment four times per week.  TR. 362.  He ordered in April 2001 that Hampton was to continue physical therapy with restrictions of no lifting more than twenty pounds and no prolonged sitting and standing.  TR. 390.

A June 8, 2001, MRI of Hampton's lumbar spine revealed the following conditions: (1) chronic anterior wedging of the T12 vertebra; (2) posterolateral disc bulge and spondylosis that incompletely compromised the inferomedial neural foramina at L3-4;[10] and (3) a loss of disc height with disc bulge and spondylosis flattening anterior thecal sac and narrowing of the neural foramina at L4-5 and L5-S1.  TR. 391-92.  An October 8, 2002, MRI of her lumbar spine revealed many of the same abnormalities.  TR. 416.

On March 8, 2002, Dr. Zeya completed a physical capacity evaluation.  TR. 51, 401-02. Dr. Zeya opined that Hampton would be subject to the following limitations: (1) stand or walk less than one hour in an eight-hour workday; (2) sit less than one hour in an eight-hour workday; (3) occasionally lift or carry a maximum of five pounds; (4) frequently lift or carry a maximum of two pounds; (5) no repetitive grasping and handling, pushing and pulling, or fine manipulation and fingering.  TR. 401.  In addition, she would require a fifteen to thirty minute break every twenty to

---

[10] Spondylosis refers generally to any lesion in the spine that is of a degenerative nature.  Stedman's at 1657.

thirty minutes, and she would need to have her legs elevated eighteen inches at least half of the time if completing sedentary work.  TR. 402.  Hampton would only occasionally be able to bend or crawl, and she would never be able to kneel, squat, climb stairs, or climb ladders.  TR. 402. Finally, Hampton would have to avoid unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, exposure to dust, fumes, and gases, and driving automotive equipment.  TR. 402.

On August 9, 2002, Dr. Zeya examined Hampton based on complaints of numbness and pain following a second motor-vehicle accident in which Hampton was involved on July 12, 2002. Dr. Zeya observed that Hampton's gait and posture were slow, but that she was able to move normally and sit uncomfortably without assistance.  TR. 413.  She had a restricted range of motion in her spine with tenderness and stiffness.  Range of motion was normal in the upper and lower extremities, but with left-sided sensory dysthesia. TR. 414.  Dr. Zeya's assessment was the following: (1) sprain/strain cervical spine; (2) sprain/strain thoracic spine; (3) sprain/strain lumbar spine; (4) sprain/strain right and left shoulder; (5) sprain/strain right hip; (6) sprain/strain right and left ankle; and (7) sprain/strain lower abdomen.  TR. 415.  Dr. Zeya ordered her to "light duty if not in pain."  TR. 415.

An MRI of the lumbar spine taken in October 2002 appeared to be the same as x-rays taken before the July 2002 accident.  TR. 416-17.  However, mild facet osteoarthropathy was observed in the lumbar spine.  TR. 419.  At the January 2003 final examination of Hampton, Dr. Zeya opined that her complaints of pain and headaches had improved but were not entirely resolved. TR. 424.  He concluded that Hampton had reached maximum medical improvement with a

permanent partial impairment of 4% in the cervical spine, 2% in the thoracic spine, and 5% in the lumbar spine.  TR. 426.

On November 19, 2003, Bridget LePre, A.R.N.P., and Todd K. Rosenthal, M.D., completed an examination of Hampton at the request of the Florida Office of Disability Determinations.  TR. 457.  Hampton complained of pain, numbness and swelling in her feet, back spasms radiating to her stomach, headaches, and leg pain.  TR. 457.  She reported stress from her previous work as a bus driver.  TR. 458.  Upon examination, she was able to walk normally, perform fine manipulation, and she had full grip strength.  She had some limitation in spinal range of motion.  TR. 459.  These professionals concluded that Hampton had chronic pain of the back, neck, legs, feet, stomach, and head, sarcoidosis, and ETOH.[11]  TR. 459.

    2.  <u>Mental Condition</u>.

From 1991 to 1994, Hampton visited Dr. Kenneth Frasier, whose credentials are not revealed in the record.  TR. 179-85.  Dr. Frasier prescribed Zoloft for Hampton's depression and Atarax to help her sleep.  TR. 179-80. Hampton stopped taking Zoloft because it caused extreme fatigue.  Thereafter, Dr. Frasier prescribed Prozac.  TR. 180.

From January to May 1994, Hampton received counseling from a therapist to cope with grief and loss issues.  TR. 318.

In September and October 2000, Hampton received treatment at Mental Health Care, Inc. TR. 368-86.  Records of this treatment indicate that Hampton experienced feelings of depression as evidenced by a depressed mood, sleep difficulty, past suicidal ideation, and isolative behavior.

---

[11] ETOH refers to ethanol and is often used as medical shorthand for alcohol abuse.

TR. 384.  Risa Gardner, Ph.D., opined that Hampton suffered from a depressive disorder not

otherwise specified and alcohol abuse.  TR. 382-83.   Hampton was assessed with a Global

Assessment of Functioning ("GAF")[12] of 50.  TR. 374.

In January and February 2001, Swapna Mukherjea, M.D., a psychiatrist, treated Hampton.

TR. 363-67.  On January 31, 2001, Hampton had her initial visit with Dr. Mukherjea.  TR. 365.

Dr. Mukherjea noted a history of family violence and sexual abuse, and that Hampton was

anxious.  TR. 365-66.  She assessed Hampton with a major depressive disorder, recurrent, severe,

with hallucinations, and a GAF of 50.  TR. 367.  Dr. Mukherjea opined that Hampton was unable

to work.  TR. 364.   On February 27, 2001, Dr. Mukherjea noted that Hampton exhibited marked

improvement in her mood, affect, and anxiety level.  TR. 363.  Nevertheless, Dr. Mukherjea

opined that Hampton's impairments would cause the following: (1) slight restriction of the

activities of daily living and difficulties in maintaining social functioning; (2) constant deficiencies

of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and

(3) continual episodes of deterioration or decompensation in work or work-like settings which

would cause her to withdraw from that situation or to experience exacerbation of signs and

symptoms.  TR. 409.

Throughout the spring and summer of 2001, Hampton continued to see Dr. Mukherjea,

who continued treatment similar to that administered in January and February, 2001.  TR. 397-

---

[12] The GAF is a score which describes the overall psychiatric functioning of a subject under an evaluation system
called the  DSM-IV, which is the fourth edition of the American Psychiatric Association's official psychiatric coding
system.  HAROLD I. KAPLAN & BENJAMIN J. SADOCK, SYNOPSIS OF PSYCHIATRY 287 (8th ed. 1998) (hereinafter "Kaplan
& Sadock").   A GAF of 41 to 50 indicates that a subject has "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g.,
no friends, unable to keep a job).  *Id.* at 299.

400.  A treatment note dated May 22, 2001, reflects that Hampton brought her three-year old granddaughter with her to the appointment.  TR. 398.  On October 5, 2001, Hampton complained of experiencing panic attacks at the thought of going back to work.  Dr. Mukherjea noted that Hampton was alert and oriented, but that her mood was depressed and her anxiety level was high.  Dr. Mukherjea assessed Hampton with a GAF of 45 and increased her Zoloft dosage to reduce her anxiety.  TR. 396.

On March 15, 2002, Dr. Mukherjea completed a mental impairment questionnaire regarding Hampton's RFC.  TR. 403-10.  Dr. Mukherjea opined that Hampton had the conditions of major depressive disorder, severe hallucinations, and a GAF of 45 to 50.  TR. 403.  She stated that Hampton was not a malingerer, and that Hampton's impairment lasted or could be expected to last at least twelve months.  TR. 404-05.  She further found that Hampton's psychological conditions did not exacerbate her pain or other physical symptoms.  TR. 405.  She opined that Hampton would have to miss work more than three times per month due to her impairments.  TR. 406.  Dr. Mukherjea opined that Hampton would not be able to work.  TR. 400.

After subsequent examinations, Dr. Mukherjea reached similar assessments and prescribed Zoloft, Xanax, and Trazodone for Hampton.  TR. 469-79.  In April and May 2003, Dr. Mukherjea examined Hampton, assessed her GAF as 50, and prescribed Zoloft, Xanax, and Ambien.  TR. 467.  At this time, Dr. Mukherjea's impression was that Hampton had a panic disorder without agoraphobia, and a depressive disorder not otherwise specified.  TR. 477.

On November 20, 2003, Walter E. Afield, M.D., performed a general clinical and mental status evaluation of Hampton.  TR. 461.  Dr. Afield's impressions were depressive disorder, back

-15-

strain/sprain, chronic pain, and a GAF of 60.  TR. 463.  Dr. Afield stated, "[i]t appears that we

have a chronically depressed patient who is reacting well to the medication.  The fact that she is

working part-time speaks to her good faith."  TR. 463.  Dr. Afield opined that Hampton had a fair

ability to relate to co-workers, deal with the public, interact with supervisors, maintain attention

and concentration, and understand, remember, and carry out complex job instructions.  TR. 464-

65.  However, her ability to deal with work stress was poor.  TR. 464.

        D.    *Reviewing Physicians' Opinions.*

On May 2, 2000, Ronald N. Panella, M.D., completed a physical RFC assessment of

Hampton based on a review of her medical records.  354-61.  Dr. Panella opined that Hampton

would be subject to the following exertional limitations: (1) occasionally lifting no more than fifty

pounds; (2) frequently lifting no more than twenty-five pounds; (3) standing, walking, or sitting no

more than six hours in an eight-hour workday; and (4) unlimited pushing or pulling.  TR. 355.  Dr.

Panella concluded that Hampton was capable of a wide range of medium work.  TR. 359.

On January 8, 2001, J. Woulfe, M.D., completed a physical RFC assessment of Hampton

based on a review of her medical records.  TR. 346-53.  This physician opined that Hampton

would be subject to the following exertional limitations: (1) occasionally lifting no more than

twenty pounds; (2) frequently lifting no more than ten pounds; (3) standing, walking, or sitting

about six hours in an eight-hour workday; and (4) unlimited pushing or pulling.  TR. 347.

On October 18, 2000, Carol Deatrick, Ph.D., completed a Psychiatric Review Technique

Form ("PRTF") evaluating Hampton's mental RFC based on a review of her medical records.  TR.

320-33.  Dr. Deatrick opined that Hampton had the non-severe mental impairments of affective

-16-

disorder and substance addiction disorder related to alcohol abuse.  TR. 320, 328.  Dr. Deatrick

further found that Hampton had the medically determinable impairments of depression and alcohol

abuse.  TR. 323, 328.  She found that Hampton would have a mild limitation in maintaining

concentration, persistence, or pace.  TR. 330.

## IV.    STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under SSI and OASDI, a claimant must

be unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which has lasted or can be expected to last for a continuous period

of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or

mental impairment" under the terms of the Act is one "that results from anatomical, physiological,

or psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C).  The Act provides

further that a claimant is not disabled if he or she is capable of performing his previous work.  42

U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  In a case seeking disability benefits under OASDI, the

claimant also must show that he or she became disabled before his or her insured status expired in

order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d

1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the

correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the

findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the

-17-

existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision.  *Id.*  While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## V.    ANALYSIS.

Hampton argues that the RFC determination made by the ALJ is erroneous because it is inconsistent with the functional capacity limitations set by her treating physicians.  She contends that the ALJ's questions to the VE were incomplete because the RFC assessment was incorrect. Finally, she asserts that the ALJ erred in his credibility determination

I begin with the ALJ's decision not to credit the opinions of treating physicians Zeya and Mukherjea.  The law requires that the opinions of treating physicians "must be given substantial or

considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (internal quotation marks and citation omitted).

The ALJ rejected the portion of Dr. Zeya's functional capacity assessment that limited Hampton to sitting for less than an hour during a work day, because she found this assessment to be inconsistent with the evidence of record and Dr. Zeya's ultimate impairment rating. The record reflects, however, that Dr. Zeya's assessment in this regard was consistent with the assessment made by Dr. Hughes, a consulting physician retained by the SSA. Dr. Hughes opined that Hampton could sit for less than an hour without a change in position. As for Dr. Zeya's ultimate impairment ratings, the Commissioner cites no source from which I can determine whether, in fact, these impairment ratings are inconsistent with the functional capacity assessments made by Dr. Zeya and Dr. Hughes.

The ALJ rejected Dr. Mukherjea's assessments that Hampton could not work because (1) she responded well to treatment; (2) she was permitted to return to school twenty hours per week in June 2001; (3) she worked part-time in June 2001; (4) she was able to handle a household that included a teen-age daughter and, at times, a three-month old granddaughter; (5) she did not seek psychiatric care from March 2002 until March 2003; and (6) she was able to do household chores. It is instructive that the Commissioner does not cite support in the record for all of the ALJ's findings.

While it is true that Dr. Mukherjea found that Hampton improved with treatment, Dr. Mukherjea concluded that, despite the improvement, Hampton's impairments would cause the following: (1) slight restriction of activities of daily living and difficulties in maintaining social

functioning; (2) constant deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and (3) continual episodes of deterioration or decompensation in work or work-like settings which would cause her to withdraw from that situation or to experience exacerbation of signs and symptoms.

The record reflects that Hampton asked for permission to return to school, but the Commissioner does not cite to any document in which Dr. Mukherjea found that Hampton had the mental functional capacity to do so.  Rather, in the progress note that reflects Hampton's request to return to school, Dr. Mukherjea wrote that Hampton "needs counseling."  TR. 397.  The record also reflects that Hampton's return to part-time work caused increased anxiety and panic attacks.  TR. 396.

I also find no evidence in the record that Hampton's granddaughter was part of her household on a regular basis, and the record reflects that Hampton's daughters lived with her sporadically.  Further, the record reflects that Hampton did not attend to household chores.

Based on this analysis, I conclude that the reasons the ALJ rejected the functional capacity assessments of Dr. Zeya and Dr. Mukherjea are not supported by substantial evidence in the record.  Accordingly, because I find that the ALJ failed to state good cause for rejecting the opinions of Hampton's treating physicians, this case is due to be reversed and remanded for further proceedings to permit the Commissioner to reevaluate Hampton's ability to work during the closed period at issue here, giving due regard to the opinions of Hampton's treating physicians.

## VI.    CONCLUSION.

For the reasons stated above, it is **ORDERED** that the decision of the SSA is **REVERSED** and the case is **REMANDED** for further proceedings.  It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and, thereafter, close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 30, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties